UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| REBECCA SYMONDS, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | No. 1:20-cv-10192-ADB |
| CREDICO (USA) LLC, IMPERIAL | * | |
| MARKETING CONCEPTS, INC., and | * | |
| VERIZON NEW ENGLAND INC., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER ON DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION**

BURROUGHS, D.J.

Plaintiff Rebecca Symonds ("Plaintiff") filed this action against Defendants Credico

(USA) LLC ("Credico"), Imperial Marketing Concepts, Inc. ("IMC"), and Verizon New England

Inc. ("Verizon," and together with Credico and IMC, "Defendants") alleging that Defendants

breached an employment contract, misclassified her as an independent contractor, and violated

various federal and state law wage and overtime laws.  See generally [ECF No. 1-1 ("Compl.")].

Currently before the Court are Credico and IMC's joint motion to compel arbitration, [ECF No.

21], which Verizon subsequently joined, [ECF No. 38].  For the reasons set forth below, the

motion, [ECF No. 21], is GRANTED and the Court dismisses the Complaint, [Compl.], without

prejudice in favor of arbitration.

I.      **BACKGROUND**

    A.      **Factual Background**

The Court draws the following facts from the Complaint and from the affidavits and

documents submitted in support of the motion to compel arbitration.  See Cullinane v. Uber

Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018).

Plaintiff is an Australian national who resides in Massachusetts.  [Compl. ¶¶ 5, 22].

Verizon is a Delaware corporation that, among other things, sells internet services to consumers.

[Id. ¶¶ 9, 14].  Credico, a Delaware corporation, controls a network of smaller companies that

directly market and sell internet services to consumers, and IMC, a Rhode Island corporation, is

one of those smaller companies.  [Id. ¶¶ 7–8, 15–16].  Plaintiff alleges that she was "jointly

employed" by Defendants from roughly November 2016 through March 2017.  [Id. ¶ 2].

In or around October 2016, Plaintiff sought employment with IMC as a Business

Development Director and engaged in negotiations with IMC's President, Kokila Alahakoon,

regarding the terms of her potential employment.  [Compl. ¶¶ 18–19].  Although the parties

initially contemplated a commission-based compensation plan, they eventually settled on an

agreement whereby Plaintiff would be paid $40 per hour.  [Id. ¶¶ 20–23].

Plaintiff began her employment on November 28, 2016, with two weeks of mandatory

training.  [Compl. ¶¶ 26–27].  She was not compensated for the time she spent at this training.

[Id. ¶ 27].  Plaintiff's primary job responsibility was to travel to stores in Massachusetts and

Rhode Island, such as Walmart, and attempt to sell Verizon services directly to consumers.  [Id.

¶¶ 30–31].  Notwithstanding her agreement with Mr. Alahakoon regarding an hourly rate, she

was paid solely by commission, and her compensation was not tied to the number of hours she

worked.  [Id. ¶¶ 34–36].

Plaintiff was generally required to be present at whichever store she was then assigned to

from 11:00 a.m. to 8:00 p.m., Monday through Saturday.  [Compl. ¶ 38].  Each workday, she

was typically required to also attend a morning meeting from 10:00 a.m. to 11:00 a.m.  [Id. ¶ 39].

Further, she was discouraged from taking lunch breaks and encouraged to work additional hours

and on Sundays.  [Id. ¶ 40].  Twice a week, Plaintiff was expected to attend mandatory social

meetings with other employees, from 8:00 p.m. to 11:00 p.m.  [Id. ¶ 41].  When Plaintiff did not

attend these social meetings, she was reprimanded.  [Id.].  In December 2016, Plaintiff began

training new recruits. [Id. ¶ 42].  This was done outside of her regular work hours and was

uncompensated.  [Id.].

Plaintiff resigned in or around March 2017.  [Compl. ¶ 47].  During the course of her

employment, Plaintiff worked more than forty hours during multiple weeks, worked at least one

Sunday, was paid only commissions, and her compensation was never tied to the number of

hours that she worked.  [Id. ¶¶ 43–44].  She received W-2 and 1099 forms for both 2016 and

2017 but never received any health insurance benefits.  [Id. ¶¶ 45–46].

### B.      Procedural Background

On November 29, 2019, Plaintiff filed a seven-count complaint against Defendants in

Bristol County Superior Court.  [Compl.]  She asserted claims against all three defendants for

(1) breach of contract, (2) violation of the Massachusetts minimum wage law, (3) violation of the

Massachusetts overtime law, (4) violation of the Massachusetts law regarding the

discouragement of lunch breaks, (5) misclassification of Plaintiff as an independent contractor

under Massachusetts law, (6) violation of the federal minimum wage law, and (7) violation of the

federal overtime law.  [Id. ¶¶ 49–84].  On January 31, 2020, Credico removed the action to this

Court, based on both federal question and diversity jurisdiction.  [ECF No. 1].  IMC and Verizon

subsequently appeared and filed responsive pleadings.  [ECF Nos. 13, 15, 28–30, 37].  On March

5, 2020, Credico and IMC jointly moved to compel arbitration.  [ECF No. 21].  Plaintiff

opposed, [ECF No. 26], and Credico and IMC replied, [ECF No. 35].  On April 23, 2020,

Verizon joined the motion, [ECF No. 38], and Plaintiff opposed again, [ECF No. 39].

## II.    LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA was enacted primarily to "overcome judicial hostility to arbitration agreements," Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 272 (1995), and it "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."  Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006)).

The party seeking to compel arbitration bears the burden of proving "that a valid agreement to arbitrate exists, the movant has a right to enforce it, the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement." Oyola v. Midland Funding, LLC, 295 F. Supp. 3d 14, 16–17 (D. Mass. 2018) (citing Bekele v. Lyft, Inc., 199 F. Supp. 3d 284, 293 (D. Mass. 2016), aff'd, 918 F.3d 181 (1st Cir. 2019)).  "When a dispute arises, the parties sometimes may disagree not only about the merits of the dispute but also about the threshold arbitrability question—that is, whether their arbitration agreement applies to the particular dispute."  Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 527 (2019).  The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes."  Id.  "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract."  Id. at 528.

Assuming "an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration or compelling the parties to arbitrate and dismissing the action." Id. at 293 (citing 9 U.S.C. §§ 3, 4). "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S. 287, 297 (2010).

## III.   DISCUSSION

Defendants assert that Plaintiff entered into an "unambiguous, valid, and enforceable arbitration agreement" with IMC, pursuant to which she agreed to submit all claims arising out of her employment relationship to final and binding arbitration. [ECF No. 22 ¶ 1]. Further, they argue that any questions as to the arbitrability of Plaintiff's claims must be resolved by an arbitrator, not the Court, pursuant to the terms of the arbitration agreement. [ECF No. 22 at 9–11]. Plaintiff argues that Defendants have failed to provide a complete and executed copy of the contract containing the agreement to arbitrate and that, even if the Court ignores this deficiency, the arbitration agreement does not provide the notice necessary when there is a waiver of a right to a jury trial. [ECF No. 26 at 3–7; ECF No. 39 at 3–5]. She also argues that the arbitration agreement is unconscionable. [ECF No. 26 at 10–11; ECF No. 39 at 5]. Finally, she asserts that Credico and Verizon, as non-parties to the arbitration agreement, cannot invoke its protection. [ECF No. 26 at 8–10; ECF No. 39 at 5–6].

### A.      An Arbitration Agreement Exists

As a threshold matter, the parties dispute whether the evidence that Defendants have proffered is sufficient to demonstrate the existence of an arbitration agreement.

In support of the motion to compel, Credico and IMC filed an affidavit from Mr. Alahakoon, Plaintiff's boss at IMC, in which he stated under oath that Plaintiff "was presented with a document entitled Mutual Arbitration of All Claims Policy" and "signed [it], as an express condition of her commencing employment with [IMC]." [ECF No. 23 ¶ 2]. He did not have the complete original, executed version of the arbitration agreement because he allowed Plaintiff to take it home with her, at her request, after she signed it but attached to his affidavit a "true and correct copy of the [arbitration agreement] that [he] required all [IMC] employees to sign, along with a copy of [Plaintiff]'s signature page." [Id. ¶ 3].

Plaintiff argues that Defendants' motion must be denied because, among other reasons, they did not provide the Court with a complete, executed copy of the arbitration agreement and although the arbitration agreement that they did provide is titled "Exhibit B," they have not provided the underlying document to which it is an exhibit. [ECF No. 26 at 3–6].

Subsequently, Defendants filed a second affidavit from Mr. Alahakoon in which he stated under oath that Plaintiff, via counsel, had sent him a packet of Plaintiff's employment forms, including the signed arbitration agreement, which he attached to his affidavit. [ECF Nos. 36, 36-1]. He further averred that the executed arbitration agreement that Plaintiff's counsel sent him is the one that Plaintiff executed and that the "Exhibit B" label is "meaningless," as the arbitration agreement "is not an exhibit to any other agreement" but rather a "standalone agreement." [ECF No. 36 ¶¶ 4–5]. Even in light of Mr. Alahakoon's second affidavit, Plaintiff maintains her objection, arguing that "it would be unfairly prejudicial for this Court to compel arbitration based solely on an exhibit to a full agreement which is not provided." [ECF No. 39 at 3–4].

Although it is Defendants' burden to demonstrate that an arbitration agreement exists, see Oyola, 295 F. Supp. 3d at 16–17, the Court finds that they have met their burden, especially given the "national policy favoring arbitration," Soto-Fonalledas, 640 F.3d at 474.  Based on the sworn statements in Mr. Alahakoon's affidavits and the documents attached thereto, it is clear that: (1) Plaintiff signed a form titled "Exhibit B - Mutual Arbitration Of All Claims Policy" on October 12, 2016, [ECF No. 36 ¶ 4; ECF No. 36-1 at 6–7]; (2) although the form she signed is difficult to read, it is identical to the arbitration agreement form that Mr. Alahakoon requires all of his employees to sign and that is attached to his first affidavit, [ECF No. 36 ¶ 4; ECF No. 23-1 at 2–3]; and (3) the "Exhibit B" label is misleading because the arbitration agreement is a standalone agreement that Plaintiff signed, [ECF No. 36 ¶ 5].  Plaintiff has submitted no affidavit of her own rebutting or contradicting these statements and, in her briefs, took special care to avoid stating with any specificity that there actually was an underlying written employment agreement to which the arbitration agreement was an exhibit.  See [ECF No. 39 at 3 ("Plaintiff's main concern was that the document with the arbitration clause was an exhibit, *presumably*, to Plaintiff's full employment contract." (emphasis added)); id. at 4 ("In this case, Defendants are seeking to enforce an exhibit of, *presumably*, an employment agreement." (emphasis added))].  Additionally, when she provided the packet of employment forms to Mr. Alahakoon, she did not include a written employment agreement, see [ECF No. 36 ¶ 3; ECF No. 36-1], nor has she specifically identified why an underlying written employment agreement, if one existed, would render the arbitration agreement unenforceable or inapplicable.  See generally [ECF Nos. 26, 39].  Instead, she has merely asserted, rather abstractly, that the Court should have an opportunity to review it.  See [ECF No. 26 at 5 ("Accordingly, an arbitration is a creature of contract, and [because] this Court does not have the full benefit of reviewing the contract, but

only an exhibit to it, this Court cannot rule that Defendants are able to invoke the arbitration clause contained as an exhibit to said contract.")].  If Plaintiff has a written employment contract or other evidence that she believes precludes enforcing the arbitration agreement, she should have (and likely would have) attached it to one of her briefs or described it in an affidavit.

Accordingly, under these circumstances, the Court concludes that Defendants have met their burden of showing that an arbitration agreement exists.

### B.      The Arbitration Agreement Delegates Arbitrability Questions

Defendants argue that any questions of arbitrability must be resolved by the arbitrator. [ECF No. 22 at 9–11].

The arbitration agreement provides that "[t]he arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this binding arbitration policy."  [ECF No. 23-1 at 2; ECF No. 36-1 at 6].  It also states that "Employer and Employee agree that all claims shall be submitted to final and binding arbitration . . . according to the provisions of the Employment Arbitration Rules of the AAA then in effect . . . ."  [Id.]. Rule 6(a) of the Employment Arbitration Rules and Mediation Procedures ("Employment Rules") of the American Arbitration Association ("AAA") provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  American Arbitration Association, Employment Arbitration Rules and Mediation Procedures, Rule 6(a) (2009).  When an arbitration agreement "delegates the arbitrability question to an arbitrator, a court may not override the contract," Henry Schein, Inc., 139 S. Ct. at 529, however, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)

(alteration in original) (internal quotation marks omitted) (quoting <u>AT&T Techs., Inc. v.</u>
<u>Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986)).

 Here, the delegation provision explicitly delegates the applicability and enforceability *of*
*the arbitration agreement itself*, which is clear and unmistakable evidence of an intent to
arbitrate arbitrability.  <u>Cf.</u> <u>Biller v. S-H OpCo Greenwich Bay Manor, LLC</u>, 961 F.3d 502,
509–10 (1st Cir. 2020) (finding that delegation was not clear and unmistakable because the
provision could be reasonably interpreted to apply to disputes related to an underlying agreement
and not disputes over the agreement to arbitrate).  Moreover, in the First Circuit, incorporation of
the AAA's rules into an arbitration agreement is clear and unmistakable evidence of an
agreement to arbitrate arbitrability.  <u>See</u> <u>Awuah v. Coverall N. Am., Inc.</u>, 554 F.3d 7, 11 (1st Cir.
2009) ("Rule 7(a) [the Rule 6(a) equivalent in the AAA's Commercial Arbitration Rules] . . . is
about as clear and unmistakable as language can get, meeting the standard we have followed."
(internal quotation marks omitted)).  Although <u>Awuah</u> involved the AAA's Commercial Rules as
opposed to the Employment Rules, the rules are essentially identical,[1] and courts in this circuit
and others have found that incorporation of the Employment Rules has the same force as the
incorporation of the Commercial Rules.  <u>See</u> <u>Van Curan v. Great Falls Ins. Co.</u>, No. 12-cv-
00047, 2012 WL 3115160, at *3–4 (D. Me. July 26, 2012); <u>see also</u> <u>McGee v. Armstrong</u>, 941

---

[1] <u>Compare</u> American Arbitration Association, Commercial Arbitration Rules and Mediation
Procedures, Rule 7(a) (2013) ("The arbitrator shall have the power to rule on his or her own
jurisdiction, including any objections with respect to the existence, scope, or validity of the
arbitration agreement or to the arbitrability of any claim or counterclaim."), <u>with</u> American
Arbitration Association, Employment Arbitration Rules and Mediation Procedures, Rule 6(a)
(2009) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including
any objections with respect to the existence, scope or validity of the arbitration agreement.").
Although the current Commercial Rules include an express reference to "the arbitrability of any
claim or counterclaim" and the Employment Rules do not, the Commercial Rules did not have
that phrase when the First Circuit decided <u>Awuah</u>.  Accordingly, that the current Employment
Rules do not include such a provision does not alter the Court's analysis.

F.3d 859, 865–67 (6th Cir. 2019); <u>Robertson v. Enbridge (U.S.) Inc.</u>, No. 19-cv-01080, 2020 WL 5754214, at *4–5 (W.D. Pa. July 31, 2020), <u>report and recommendation adopted</u> 2020 WL 5702419 (W.D. Pa. Sept. 24, 2020); <u>Pacelli v. Augustus Intel., Inc.</u>, 459 F. Supp. 3d 597, 612 (S.D.N.Y. 2020); <u>Anderson v. Skolnick</u>, No. 19-cv-18138, 2020 WL 2062193, at *4 (D.N.J. Apr. 29, 2020); <u>Vargas v. Bay Terrace Plaza LLC</u>, 378 F. Supp. 3d 190, 195–96 (E.D.N.Y. 2019); <u>cf.</u> <u>Moss v. Brock Servs., LLC</u>, No. 19-cv-00084, 2019 WL 3806375, at *8 (D. Me. Aug. 13, 2019) (finding that incorporation of JAMS Employment Arbitration Rules demonstrates clear and unmistakable evidence of intent to delegate).

The arbitration agreement at issue here states that (1) the arbitrator has exclusive authority to decide matters of interpretation, applicability, and enforceability, and (2) arbitration will be conducted according to the AAA's Employment Rules, which delegate questions of arbitrability to the arbitrator.  [ECF No. 23-1 at 2; ECF No. 36-1 at 6].  Accordingly, the Court must decide whether Plaintiff's remaining arguments implicate questions of arbitrability and, if so, it must respect the delegation reflected in the arbitration agreement.  Plaintiff argues that the arbitration agreement is invalid because it provides insufficient notice, and unconscionable, and that as nonsignatories, Credico and Verizon are precluded from enforcing it.  [ECF No. 26 at 6–11].

First, with regard to notice, Plaintiff asserts that the arbitration agreement provides insufficient notice that statutory claims would be subject to arbitration, rather than resolved by jury trial, and that it is therefore invalid.  [ECF No. 26 at 6–7].  With this argument, Plaintiff is challenging the validity of the arbitration agreement itself, rather than just the delegation provision.  <u>See</u> [<u>id.</u> at 7 ("Looking at the totality of the circumstances this Honorable Court should conclude that the arbitration agreement at issue does not provide sufficient notice that

Mrs. Symonds was waiving her rights to a jury trial in the context of her employment claims.")].
As such, the Court must enforce the delegation provision which requires that an arbitrator decide
the validity of the arbitration agreement.  Khath v. Midland Funding, LLC, 334 F. Supp. 3d 499,
512 (D. Mass. 2018) (citing Awuah, 554 F.3d at 12–13); see Tissera v. NRT New Eng., 438 F.
Supp. 3d 115, 122 (D. Mass. 2020) ("Therefore, unless the plaintiff 'challenge[s] the delegation
provision specifically,' the court must enforce the delegation provision and 'leav[e] any
challenge to the validity of the [arbitration agreement] as a whole for the arbitrator.'" (alterations
in original) (quoting Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 72 (2010))).  This is
consistent with the express delegation clause, which delegates all disputes relating to
"enforceability," [ECF No. 23-1 at 2; ECF No. 36-1 at 6], as well as with the plain meaning of
Rule 6(a) of the AAA's Employment Rules, which provides that the arbitrator "shall have the
power to rule on his or her own jurisdiction, including any objections with respect to the
existence, scope or validity of the arbitration agreement," American Arbitration Association,
Employment Arbitration Rules and Mediation Procedures, Rule 6(a) (2009).  Accordingly, the
issue of whether the asserted insufficiency of notice renders the arbitration agreement invalid
will be determined by the arbitrator.

Plaintiff next argues that the arbitration agreement is unconscionable and should not be
enforced by the Court.  [ECF No. 26 at 10–11].  Specifically, she asserts that the agreement is
substantively unconscionable because it deprives her of her constitutional right to a jury trial and
procedurally unconscionable because she had no opportunity to negotiate it, was unaware of the
differences between arbitration and a jury trial, and "her immigration status and ability to remain
in the United States depended on her obtaining this job."  [Id. at 11].  Because Plaintiff is again
challenging the arbitration agreement as a whole, the delegation provision requires that the Court

defer to the arbitrator.  See Tissera, 438 F. Supp. 3d at 122 (finding that court could not adjudicate unconscionability where delegation provision existed and the party did not specifically challenge it).

Finally, Plaintiff maintains that nonsignatories Credico and Verizon cannot enforce the arbitration agreement under an equitable estoppel theory or as third-party beneficiaries.  [ECF No. 26 at 8–10].  This, too, is a question of arbitrability.  The agreement plainly delegates questions of enforceability to the arbitrator, see [ECF No. 23-1 at 2 ("The arbitrator has exclusive authority to resolve any dispute relating to the . . . enforceability of this binding arbitration policy.")], and whether Credico and Verizon can enforce the agreement is another question of enforceability, although one more specifically directed to those parties, see De Angelis v. Icon Ent. Grp. Inc., 364 F. Supp. 3d 787, 797 (S.D. Ohio 2019) ("Whether a nonsignatory can enforce the arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant.").

Moreover, the First Circuit addressed this issue in Apollo Comput., Inc. v. Berg, where it concluded that whether nonsignatory assignees could enforce an arbitration agreement against a signatory involved the existence and validity of the arbitration agreement and was therefore delegated to the arbitrator.  886 F.2d 469, 473–74 (1st Cir. 1989).  Although Apollo involved an assignment (as opposed to an attempt to invoke the equitable estoppel or third party beneficiary doctrines), the Court, which has not found any binding authority directly on point, finds its holding instructive.  Moreover, given that assignment, third-party beneficiary theory, and estoppel are all traditional contract law principles that permit nonsignatories to enforce arbitration agreements, the Court sees no reason to draw a distinction between them for present purposes.  See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,

LLC, 140 S. Ct. 1637, 1643–44 (2020) ("The traditional principles of state law that apply under Chapter 1 [of the Federal Arbitration Act] include doctrines that authorize the enforcement of . . . arbitration agreements . . . by nonsignatories through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." (internal citations and quotation marks omitted)).  Accordingly, because the arbitration agreement delegates the arbitrability determination to the arbitrator, it is the arbitrator, rather than the Court, who must decide whether nonsignatories Credico and Verizon can compel Plaintiff to arbitrate her claims against them.

## IV.   CONCLUSION

For the reasons stated above, the motion to compel arbitration, [ECF No. 21], is GRANTED.  The Court COMPELS arbitration in accordance with the arbitration agreement and DISMISSES this action without prejudice.

**SO ORDERED.**

December 3, 2020                                    /s/ Allison D. Burroughs
                                                   ALLISON D. BURROUGHS
                                                   U.S. DISTRICT JUDGE